Matter of Coalition for Fairness in Soho & Noho, Inc. v City of New York (2026 NY Slip Op 00076)

Matter of Coalition for Fairness in Soho & Noho, Inc. v City of New York

2026 NY Slip Op 00076

Decided on January 13, 2026

Court of Appeals

Rivera, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on January 13, 2026

No. 112 

[*1]In the Matter of The Coalition for Fairness in Soho and Noho, Inc., et al., Respondents,
vCity of New York, et al., Appellants.

Jonathan Schoepp-Wong, for appellants. 
Christopher M. Kieser, for respondents.
Christopher Marte and Ronnie Wolf et al., amici curiae.

RIVERA, J.

:
In 1971, New York City established the "Joint Living-Work Quarters for Artists" (JLWQA) use designation, which restricted legal occupancy in certain non-residential buildings in the neighborhoods of SoHo and NoHo to artists who are certified pursuant to state law (see Multiple Dwelling Law [MDL] §§ 275-278). Petitioners challenge a 2021 rezoning initiative that created a procedural mechanism for occupants to convert their JLWQA units in these buildings to unrestricted residential use for a one-time fee, which is calculated based on the unit's square footage (see NY City Zoning Resolution [ZR] § 143-13). Petitioners claim that the fee is subject to heightened scrutiny as an unconstitutional condition, and that it amounts to a taking of their property without just compensation in violation of the Fifth Amendment's Takings Clause.
We conclude that petitioners do not have a compensable property interest within the meaning of the Takings Clause, as the United States Supreme Court has interpreted it, and that the fee therefore does not constitute a taking. The Takings Clause protects property owners against exploitative governmental conduct that seeks to take property without paying for it (see Sheetz v County of El Dorado, 601 US 267, 275 [2024]; Armstrong v United States, 364 US 40, 49 [1960]). The newly granted opportunity to transform the essential nature of a restricted JLWQA unit into a different, unrestricted interest is not in itself a property interest. Rather, it is the restricted JLWQA unit itself, and the concomitant bundle of property rights resulting from the City's designation as such, that constitutes the property that the government cannot take without just compensation. The creation of an optional pathway to convert to unrestricted residential use upon payment of the fee has not extinguished or diminished petitioners' property rights in their JLWQA units. The City gains no interest in the units upon conversion, and even if [*2]petitioners held a constitutionally protected property interest in converting their property, the rezoning plan does not subject petitioners to any governmental coercion to transfer property that they would otherwise retain.
Furthermore, a typical Takings Clause case involves the government's physical acquisition or use of private land without compensation, or its monetary exaction from a property owner in lieu of a transfer of their private property interest. By contrast, a standalone monetary fee such as the one in this case does not implicate the Takings Clause merely because it is levied upon a property owner.
Accordingly, the concerns animating the Supreme Court's Takings Clause jurisprudence are absent here. Therefore, we reverse the Appellate Division's order and hold that the City respondents are entitled to judgment declaring that the fee does not violate the Takings Clause and should not have been enjoined as violative of such.
I.
Joint Living-Work Quarters for Artists in SoHo and NoHo
Neighborhoods located south and north of Houston Street in Manhattan, respectively known as SoHo and NoHo, are two of the most expensive residential and commercial areas in New York City today (see Envision SoHo/NoHo, Envision SoHo/NoHo: A Summary of Findings and Recommendations, at 40 [Nov. 2019] ["Envision SoHo/NoHo Report"]). These neighborhoods were previously thriving centers of manufacturing and zoned for industrial use, with cast-iron loft buildings constructed to accommodate those enterprises (see id. at 26). However, by the mid-1900s, manufacturing activity in the area had declined, leaving these spacious interior lofts mostly vacant (see id. at 24, 26). Over time, an influx of artists began to occupy these lofts illegally, using them as spaces in which to both create art and reside (see id. at 24, 26, 30-31, 36, 55). The buildings' floorplans and high ceilings were uniquely suited to these artists' endeavors, and eventually, the surrounding area became a hub of artistic creativity (see id. at 26-27, 30; see also Grace Glueck, Neighborhoods: SoHo Is Artists' Last Resort, NY Times, May 11, 1970, available at https://www.nytimes.com/1970/05/11/archives/neighborhoods-soho-is-artists-last-resort-neighborhoods-soho-is.html [last accessed Dec. 3, 2025] [describing SoHo as a burgeoning artist community, yet at the same time "a kind of last resort for artists, the only area left in Manhattan where the loft space they need is still available at reasonable rates," even though they have to live there illegally because the area is zoned for light manufacturing use]).
In 1971, New York City established the JLWQA use designation to accommodate artists' unlawful residences in these spaces in SoHo, and in 1976, the City expanded the designation to NoHo (see MDL §§ 275-278; see also Envision SoHo/NoHo Report, at 30, 36). The law recognized legal occupancy for artists who are certified under state law as persons "regularly engaged in the fine arts, such as painting and sculpture," or in the performing arts or music composition (MDL § 276; see also Envision SoHo/NoHo Report, at 30-31). As the parties acknowledge, the JLWQA use designation runs with the property.
Through the years, artists of limited means have been able to lawfully reside and pursue their creative work in these spaces as a result of the JLWQA use designation (see Envision SoHo/NoHo Report, at 26, 55; Michael Spector, If You're Thinking of Living In: SoHo, NY Times, Jan. 16, 1983, available at https://www.nytimes.com/1983/01/16/realestate/if-you-re-thinking-of-living-in-soho.html [last accessed Dec. 3, 2025]). Eventually, SoHo and NoHo became popular neighborhoods and attracted non-artists who resided in JLWQA units in contravention of the use restrictions (see [*3]Envision SoHo/NoHo Report, at 24, 31, 36, 55; Michael Spector, If You're Thinking of Living In: SoHo, NY Times, Jan. 16, 1983, available at https://www.nytimes.com/1983/01/16/realestate/if-you-re-thinking-of-living-in-soho.html [last accessed Dec. 3, 2025]). Some unauthorized non-artist residents were able to secure lawful occupancy through the Loft Law, a separate statute enacted in 1982 (see generally MDL §§ 280-287),[FN1] but not all JLWQA units in SoHo and NoHo were eligible for Loft Law coverage (see Envision SoHo/NoHo Report, at 24, 31). In 1986, the City approved a zoning amendment that granted "amnesty" to existing JLWQA occupants who did not meet certified artist requirements, allowing such residents to legally occupy their JLWQA units (see Envision SoHo/NoHo Report, at 31, 55). As the parties have stipulated during this litigation, the amnesty applied only to occupants of JLWQA units at the time of the amendment and left certified artist requirements in place for future occupants. This zoning amendment also established legal succession rights for family members of authorized JLWQA occupants. As the parties have further stipulated, these succession rights remain in effect and apply regardless of whether the departing JLWQA occupant was a certified artist or was authorized to reside in the unit pursuant to the statutory amnesty. The 1986 amendment did not, however, convert JLWQA units into fee simple estates, and the JLWQA designation continued to run with the property.
The City's certification of artists declined over the years as the SoHo and NoHo neighborhoods' populations grew and the area's financial prosperity increased (see Envision SoHo/NoHo Report, at 31, 34, 39). Today, these neighborhoods are largely racially and economically homogeneous, and they are generally unaffordable to the majority of New Yorkers (see id. at 34, 40). At the same time, although many unauthorized JLWQA occupants were granted amnesty via the 1986 zoning amendment, while others obtained legal residential status under the Loft Law, significant numbers of non-familial successor non-artists have continued to illegally occupy JLWQA units, bolstered by the City's lack of enforcement of the JLWQA use designation (see id. at 24, 31, 36, 55).[FN2] The City asserts that by 2022, an estimated 1,600 out of 1,636 JLWQA-designated units were occupied by non-conforming households that did not comply with the use restrictions and only four artists received JLWQA certification in the last year.
In 2021, the City Council passed a zoning amendment, rezoning a 56-block radius in SoHo and NoHo to create the Special SoHo-NoHo Mixed Use District (see ZR § 143-00 et seq.). As set forth in the amendment's General Purposes section, the rezoning was
intended, among other purposes, to "enhance neighborhood economic diversity by broadening the range of housing choices for residents of varied incomes," "reinforce the longstanding mixed-use character of the area by allowing a wider range of residential, commercial and community facility [*4]uses while retaining significant concentration of commercial and manufacturing space," "ensure the development of buildings is compatible with existing neighborhood character," "sustain SoHo/NoHo's cultural legacy and support [the City's] creative economy with provisions that support arts, cultural and creative uses, organizations and their broader public audience," "retain jobs within [the City]," and "promote the most desirable use of land in accordance with a well-considered plan and thus conserve the value of land and buildings, and thereby protect City tax revenues" (id. § 143-00).
The JLWQA use designation continues to exist under the rezoning plan, but no additional units may receive that designation (see id. § 143-13). In 2022, the State also extended additional amnesty to all permanent unauthorized occupants of JLWQA units whose residency began on or before the rezoning on December 15, 2021 (see MDL § 276). Put differently, JLWQA occupants who were non-artists and did not otherwise inherit the unit from a former authorized resident were treated as compliant with JLWQA restrictions "under the same rights" as a certified artist (see id.). Despite this statutory amnesty, any residents who took or take occupancy of a JLWQA unit subsequent to December 15, 2021 are still subject to the JLWQA use designation and its certified artist requirement. That is, both the City's 1986 and the State's 2022 grants of amnesty were to the residents of certain buildings and their familial successors, and the grants of amnesty did not run with the property.
The City's new rezoning plan does not alter the zoning of plaintiffs' property or diminish their rights in any way. Instead, it permits plaintiffs and other JLWQA owners to convert their units, at any future time, to unrestricted residential use upon payment of a one-time "nonrefundable" Arts Fund fee (the Fee) of $100 "per square foot of floor space to be converted," with yearly adjustments of the amount per square foot tied to inflation (see ZR § 143-13 [establishing the process for conversion upon payment of the Fee]). Under the zoning amendment, payment of the Fee "shall be a precondition to the filing for or issuing of any building permit allowing the conversion" from JLWQA status to unrestricted residential use (id. § 143-13). The City's Department of Cultural Affairs oversees the Arts Fund, and it allocates grants from the fund on a competitive basis to local artists, nonprofits, and other cultural organizations, including applicants from outside the rezoned district in other parts of Lower Manhattan (see id.). The parties stipulated that the JLWQA "occupancy restrictions . . . limit only occupancy, and not sale." "Thus, absent some agreement between transacting parties, current [JLWQA] owners . . . are not responsible for converting a JLWQA [unit] to residential use prior to sale" to a non-artist, and "[s]ellers of JLWQA [units] are also not required to inquire about how a potential purchaser will comply with occupancy requirements."
II.
Petitioners' Challenge to the Arts Fund Fee
Petitioners filed the underlying combined article 78 and declaratory judgment action against respondents the City, the City's Department of City Planning and Planning Commission, the City Council, and Eric Adams, in his official capacity as Mayor of the City, challenging, as relevant to this appeal, the Fee, as a violation of the Takings Clause. Petitioners are The Coalition for Fairness in SoHo and NoHo, Inc.—a self-described grassroots community-based organization representing owners, tenants, and other residents of SoHo and NoHo who are impacted by the 2021 rezoning—and several individual JLWQA residents who legally occupy their units, many by virtue of their relationship to a deceased certified artist.
Supreme Court dismissed the petition, holding that the Fee is a monetary obligation not subject to the Takings Clause. The Appellate Division reversed Supreme Court's order, granted the petition, declared the Fee unconstitutional, and enjoined enforcement of the Fee (233 AD3d 433, 433 [1st Dept 2024]). The Appellate Division concluded, without further explanation, that the Fee is a permit condition subject to the unconstitutional conditions test developed by the Supreme Court in Nollan v California Coastal Commn. (483 US 825 [1987]) and Dolan v City of Tigard (512 US 374 [1994]) (233 AD3d at 434). As the Appellate Division explained, that test requires, first, that the Fee have an essential nexus to the government's land use interest, and second, that the Fee be roughly proportional to the harms to certified artists imposed by conversion (id.). The Appellate Division held that the City failed to establish both prongs of the Nollan/Dolan test (id. at 434-435).
Respondents appeal as of right on constitutional grounds (CPLR 5601 [b] [1]). We now reverse the Appellate Division's order, as petitioners have not identified a property interest within the meaning of the Takings Clause.
III.
A.
In the usual challenge to "zoning [pursuant to] legislative act," the enactment is "entitled to the strongest possible presumption of validity" (Church v Town of Islip, 8 NY2d 254, 258 [1960] [citations omitted]), and "only as a last resort should courts strike down [such] legislation on the ground of unconstitutionality" (Lighthouse Shores, Inc. v Town of Islip, 41 NY2d 7, 11 [1976]). In such cases, a property owner "who claims that [a] land [use] regulation has effected a taking of [their] property bears the heavy burden of overcoming the presumption of constitutionality that attaches to the regulation and of proving every element of [their] claim beyond a reasonable doubt" (de St. Aubin v Flacke, 68 NY2d 66, 76 [1986]; see also Lighthouse Shores, Inc., 41 NY2d at 11; Town of Huntington v Park Shore Country Day Camp of Dix Hills, 47 NY2d 61, 65 [1979]). However, the strong presumption of validity does not apply where, as here, petitioners allege that the City's zoning amendment imposes an unconstitutional condition, triggering heightened scrutiny (see Nollan, 483 US at 837; Dolan, 512 US at 391).
B.
The Fifth Amendment's Takings Clause, as applied to the States pursuant to the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation" (US Const 5th Amend). "The aim of the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole' " (Eastern Enters. v Apfel, 524 US 498, 522 [1998], quoting Armstrong, 364 US at 49; see also Twin Lakes Dev. Corp. v Town of Monroe, 1 NY3d 98, 104 [2003] [citations omitted]).
The U.S. Supreme Court has recognized three categories of government actions implicating the Takings Clause relevant to this appeal. First, the " 'classi[c] taking' " occurs when "the government directly appropriates private property for its use" (Eastern Enters., 524 US at 522, quoting United States v Sec. Indus. Bank, 459 US 70, 78 [1982]). "Where governmental action results in '[a] permanent physical occupation' of the property," the Supreme Court has uniformly recognized that such invasion constitutes a per se taking (Nollan, 483 US at 831-832, quoting Loretto v Teleprompter Manhattan CATV Corp., 458 US 419, 432-433, 434-435 [1982]; see also Loretto, 458 US at 426-434; Eastern Enters., 524 US at 530). The second category encompasses [*5]instances where the government imposes a condition on a land-use permit that would constitute a per se taking were it not a requirement to obtain such a permit but instead imposed directly (see Koontz v St. Johns River Water Mgt. Dist., 570 US 595, 612 [2013], citing Nollan, 483 US at 831, and Dolan, 512 US at 384). The third category, as identified in Koontz, reflects a variation of the second category, and arises when the government conditions a land-use permit on a monetary payment requested "in lieu of" the landowner ceding a property interest to the government (id.).
The second and third categories are analyzed under the unconstitutional conditions doctrine, which "vindicates the Constitution's enumerated rights by preventing the government from coercing people into give them up" (id. at 604, citing Perry v Sindermann, 408 US 593 [1972], and Memorial Hosp. v Maricopa County, 415 US 250 [1974]). As the Supreme Court has repeatedly emphasized, government cannot demand a relinquishment of an interest in property through land-use regulation, which it could not permissibly impose outright, without compensating the property owner (see id. at 612). For example, conditioning a permit to rebuild a house on the requirement that the property owner transfer a public easement to the government triggers the doctrine (see Nollan, 483 US at 831, 834-837; Dolan, 512 US at 384).
Government demands challenged as unconstitutional conditions are subject to the two-pronged heightened scrutiny test that the Supreme Court developed in Nollan and Dolan (see Koontz, 570 US at 604-606). Under that test, a land use permit condition is permissible if it: 1. has an "essential nexus" to the government's land-use interest; and 2. is "rough[ly] proportional[ ]" to the impact of granting the permit on that land-use interest—in other words, to the "social costs of the [permit] applicant's proposal" (Sheetz, 601 US at 275-276, quoting Nollan, 483 US at 837, and Dolan, 512 US at 391; see Koontz, 570 US at 605-606). The nexus requirement "ensures that the government is acting to further its stated purpose, not leveraging its permitting monopoly to exact private property without paying for it" (Sheetz, 601 US at 275, citing Nollan, 483 US at 841). The rough proportionality prong further ensures against government overreach because "[a] permit condition that requires a landowner to give up more than is necessary to mitigate harms resulting from [their proposed activity] has the same potential for abuse as a condition that is unrelated to that purpose" (id. at 276, citing Dolan, 512 US at 393).
Based on the unique concerns arising from the permitting process, the Supreme Court has fashioned a " 'special application' " of the unconstitutional conditions doctrine for land-use permitting (Koontz, 570 US at 604-605, quoting Lingle v Chevron U.S.A. Inc., 544 US 528, 547 [2005]). That application recognizes that "land-use permit applicants are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits because the government often has broad discretion to deny a permit that is worth far more than the property it would like to take" (id.). While the doctrine permits the government to "choose whether and how a permit applicant is required to mitigate the impacts of a proposed [land-use activity], . . . it [bars the government from] leverag[ing] its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts" (id. at 606).
"A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing" (id. at 612). Where the predicate is satisfied, the challenged condition is reviewed under the two-pronged heightened scrutiny test. In Nollan and Dolan, the predicate was straightforward. The permit in Nollan was conditioned upon granting an easement across the owner's land (see Nollan, 433 US at 827, 831), and the permit in Dolan was conditioned upon transferring two parcels of the owner's property (see Dolan, 512 US at 377, 384). Either condition, if ordered directly, would [*6]have amounted to a permanent physical occupation of the property, and therefore gave rise to a per se taking (see Koontz, 570 US at 612, citing Nollan, 433 US at 831, and Dolan, 512 US at 384).
In Koontz, the landowner sought to develop property in a manner that would impact protected wetlands (id. at 600-601). To mitigate the environmental effects of his proposal, the owner offered to deed to the water management district (the District) a conservation easement on a portion of his property (id. at 601). The District conditioned its approval of the necessary permits for the redevelopment on one of two conditions: either the owner had to substantially reduce the size of the planned development and deed the District a larger conservation easement, or the owner had to grant the government the conservation easement he initially proposed and also pay for contractors to conduct offsite mitigation construction at a site miles away that would enhance District-owned wetlands (id. at 601-602). The Supreme Court concluded that "the demand for money . . . 'operate[d] upon . . . an identified property interest' by directing the owner of a particular piece of property to make a monetary payment" and thus "burdened [the] petitioner's ownership of a specific parcel of land" (id. at 613, quoting Eastern Enters., 524 US at 540 [Kennedy, J., concurring in judgment and dissenting in part]). Thus, the demand for funds was a monetary exaction resembling the Court's prior cases holding that "the government must pay just compensation when it takes a lien—a right to receive money that is secured by a particular piece of property" (id. [citations omitted]). The Supreme Court explained,
"The fulcrum this case turns on is the direct link between the government's demand and a specific parcel of real property. Because of that direct link, this case implicates the central concern of Nollan and Dolan: the risk that the government may use its substantial power and discretion in land-use permitting to pursue governmental ends that lack an essential nexus and rough proportionality to the effects of the proposed new use of the specific property at issue, thereby diminishing without justification the value of the property" (id. at 614 [footnote omitted]).
The District's request for money was therefore subject to Nollan/Dolan scrutiny, and the Court remanded to the State court for consideration of the merits (id. at 619).
Thereafter, in Sheetz, the Supreme Court clarified that "[t]he Takings Clause . . . prohibits legislatures and agencies alike from imposing unconstitutional conditions on land-use permits" (601 US at 279).[FN3] Thus, legislative and administrative actions involving the taking of property must satisfy the nexus and rough proportionality requirements established in Nollan and Dolan (id.). However, as Justice Sotomayor expressly noted in her concurrence in Sheetz, joined by Justice Jackson, the Court's decision did not reach the "important threshold question to any application of Nollan/Dolan scrutiny: whether the permit condition [at issue] would be a compensable taking if imposed outside the permitting context" (id. at 280-281 [Sotomayor, J., concurring]; see also Lingle, 544 US at 546-[*7]547 [explaining that in both Nollan and Dolan, the Court began its analysis by stating the premise that the government could not have directly appropriated the easements in question without running afoul of the Constitution, as they would have constituted per se physical takings]).
With these legal principles and the Supreme Court's relevant jurisprudence in mind, we now turn to petitioners' claim that the Fee is an unconstitutional condition. We begin, as we must, with the "antecedent question" of whether the Fee would constitute a compensable taking if it were imposed directly, outside of the permitting process, rather than as a condition of receiving a permit (Sheetz, 601 US at 281 [Sotomayor, J., concurring]). Because we conclude that it would not, we need not consider whether the Fee would survive Nollan/Dolan scrutiny.
IV.
According to petitioners, the Fee is an unconstitutional condition leveraged by the City to withhold the benefit of converting their property from the restricted JLWQA designation to an unrestricted residential use classification. However, petitioners' claim fails as a threshold matter because petitioners have failed to identify any compensable property interest within the meaning of the Takings Clause that the Fee affects. Moreover, the Fee is not requested "in lieu of" a transfer of a private property interest, and thus it would not constitute a compensable taking if it were imposed directly rather than as a condition of receiving a conversion permit.
A.
A JLWQA unit owner does not have a property interest that could be surrendered or infringed by the zoning regulation's requirement that the owner must pay the City a monetary fee if they wish to convert their unit from JLWQA status to an unrestricted use residential unit (see ZR § 143-13). Petitioners knowingly assumed a property interest in JLWQA-restricted spaces. Contrary to their view and the dissent's suggestion, they do not seek to simply make use of their property in a way currently prohibited by the City (see dissenting op at 21). Rather, petitioners seek to transform the property into a wholly different type of interest. Unlike a fee simple owner who wishes to use their property in accordance with the rights afforded to them as the holder of such an estate, petitioners seek to replace their current interest with one that by its nature is foreign and contrary to the JLWQA use designation. Petitioners are not merely seeking to remove a restriction on how they can use their property, as the dissent would have it (see dissenting op at 20-21), but rather they seek to convert one type of property with a distinct and limited set of interests—as a restricted space intended only for certified artists' use and residence—into a wholly different type of property—a space for unrestricted residential use. Petitioners may desire a property interest in a more valuable and less restrictive form, and they may want it without strings attached, but the opportunity to relinquish one form of property to acquire another, in exchange for a monetary payment to an arts fund, is not a taking.
To the extent petitioners claim that the City's rezoning plan has an adverse impact, the Fee does not eliminate or burden petitioners' existing property interest. Indeed, even with the Fee, petitioners' JLWQA units remain marketable in a highly desirable geographic area of New York City. Here, there is simply no property that the City could directly seize, through eminent domain or condemnation, to allow petitioners to convert their JLWQA spaces (see US Const 5th Amend; NY Const, art I, § 7; Eminent Domain Procedure Law § 101 et seq.; General Municipal Law § 74). Thus, the Fee does not
"implicate[ ] the central concern of Nollan and Dolan: the risk that the government may use its substantial power and discretion in land-[*8]use permitting to pursue governmental ends that lack an essential nexus and rough proportionality to the effects of the proposed new use of the specific property at issue, thereby diminishing without justification the value of the property" (Koontz, 570 US at 614 [emphasis added]).
Therefore, the Fee imposed on the owner of a JLWQA unit for the opportunity to acquire a greater property interest than they currently hold is not a compensable taking.
B.
Petitioners' invocation of the unconstitutional conditions doctrine is particularly inapt. That doctrine, as articulated in Nollan and Dolan, "prevent[s] the government from coercing [property owners] into giving . . . up" their "Fifth Amendment right to just compensation for property the government takes when [such] owners apply for land-use permits" (Koontz, 570 US at 604, citing Lingle, 544 US at 547, and Dolan, 512 US at 385). In the context of governmental fees, only where such demand for money is "functionally equivalent" to a compensable land use exaction does it constitute a "monetary exaction" encompassed by the Takings Clause (id. at 612).[FN4]
Contrary to the dissent, we do not read Koontz to imply that the simple condition of paying money in relation to a land-use permit requires application of Nollan/Dolan scrutiny (see dissenting op at 2, 9-16, 18).[FN5] Rather, the Supreme Court's holding in Koontz applies only to monetary [*9]conditions which are offered as an alternative to, or "in lieu of," a condition that would be a per se taking if imposed directly. The "direct link between the government's demand and a specific parcel of real property" identified in Koontz turned on the fact that the monetary payment there was demanded "in lieu of" non-monetary property, in that case a transfer of a conservation easement on a portion of the petitioner's land, rather than the generalized link to petitioner's property necessarily implicated by the process of seeking a permit affecting the use of their land (see 570 US at 614). The unconstitutional conditions doctrine was invoked to prevent the government from coercing the landowner into giving up not the money itself, but instead the easement that the fee was demanded in lieu of. Indeed, Koontz expressed concern with exempting in-lieu fees from constitutional scrutiny because that would make it "very easy for land-use permitting officials to evade the limitations of Nollan and Dolan" (id. at 612). As the Supreme Court explained, by "provid[ing] a permit applicant with one alternative that satisfies" Nollan/Dolan, "a permitting authority wishing to exact an easement could simply give the owner a choice of either surrendering an easement or making a payment equal to the easement's value" (id. at 612 [emphasis added]). The Court in Koontz made clear that the guarantees of the Takings Clause cannot be circumvented in such a manner (id.). The dissent misreads Koontz by suggesting that the District did not demand the monetary payment in lieu of the transfer of a property interest (see dissenting op at 9-16). The Supreme Court's opinion makes clear that the District conditioned its permit approval on either the transfer of a larger conservation easement or a monetary payment, and the Court held that such a condition may not be imposed unless it satisfies Nollan/Dolan scrutiny (Koontz, 570 US at 611-612).
The dissent's reading of Koontz as extending Nollan/Dolan to encompass any "monetary exaction demanded from a real property owner . . . in exchange for a governmental benefit tied to their property" (dissenting op at 2) would impermissibly subject every monetary fee attached to a permit application to heightened scrutiny, even where the government has in no way commandeered "the relinquishment of funds linked to a specific identifiable property interest such as a bank account or parcel of real property" (dissenting op at 15, quoting Koontz, 570 US at 614). Moreover, to conclude, as the dissent does, that the Fee in this case has a sufficient connection to property based merely on the fact that it may be paid by JLWQA property owners would significantly broaden the kinds of monetary fees triggering scrutiny under the Takings Clause, and would have drastic implications (see dissenting op at 2, 9-16, 18). If we adopted petitioners' and the dissent's radical view that every land-use related demand for money deprives a property owner of a constitutional benefit, then every fee imposed by the government in connection with a land-use permit would constitute a taking and would need to be "properly tailored to pass the Nollan/Dolan test" (dissenting op at 16). This view works a sweeping doctrinal expansion wholly untethered from precedent. Indeed, the Supreme Court expressly rejected such an overly broad reading of the unconstitutional conditions doctrine in Koontz itself, cautioning that its opinion "d[id] not affect the ability of governments to impose property taxes, user fees, and similar laws and regulations that may impose financial burdens on property owners" (570 US at 615; see Eastern Enters., 524 US at 540-541 [Kennedy, J., concurring in judgment and dissenting in part] [joining with four dissenting Justices in concluding that an obligation of certain employers to pay health care benefits for coal-industry retirees did not constitute a taking]). At no point does the dissent explain how we may distinguish [*10]between the fees demanded from property owners which Koontz leaves unaffected and those which must satisfy Nollan/Dolan scrutiny. Therefore, the dissent's interpretation of Koontz gives rise to an intractable line-drawing problem.
Thus, contrary to the dissent's view, Koontz is properly understood as limited to "in lieu of" fees, where a property owner faces a choice between paying money or transferring an interest in real property as a condition of obtaining their desired land-use permit. The dissent argues that the issue in Koontz was "that development of the full [acreage initially planned] was conditioned on the monetary exaction . . . , not [that the] demand for money [was] 'in lieu' of an easement" (dissenting op at 13). But the language in Koontz on which the dissent relies was aimed at a threshold argument raised by the District: that there was no need to scrutinize the monetary demand because the alternative condition (reducing the development and transferring a larger easement) satisfied the Nollan/Dolan test (570 US at 611). The Court explained that even if that were so, the unconstitutional conditions analysis would be incomplete, because the petitioner would still be compelled to accede to the monetary demand if he wanted to develop the full proposed acreage instead of the smaller acreage (id.). Yet, the Court's clarification does not resolve whether the constitutionality of the government's demand turned on its in-lieu nature. As noted above, the Court observed in Koontz that such a structure can readily be deployed to elude Nollan/Dolan scrutiny (id. at 612). Indeed, the pressure to forgo the right to just compensation is the core concern behind Nollan/Dolan, and that is why the "direct link" between the monetary demand and "the specific parcel of real property" in Koontz triggered heightened scrutiny—not simply because the monetary demand was requested in connection with a land-use permit (id. at 614).
Unlike in Koontz, the Fee in this case is not sought as an alternative to, or "in lieu of," a condition that would be a per se taking if imposed directly, and it does not implicate the Takings Clause for that reason (id. at 612). Furthermore, contrary to the dissent's view, the demand for money at issue here does not " 'operate upon . . . an identified property interest' " or "burden[ ] . . . petitioner[s'] ownership of a[ny] specific parcel[s] of land" within the meaning of the Supreme Court's jurisprudence (id. at 613, quoting Eastern Enters., 524 US at 540 [Kennedy, J., concurring in judgment and dissenting in part]). The City made no "[e]xtortionate demand[ ] for property" and it has not offered "a gratuitous governmental benefit" in exchange for petitioners forfeiting their right to just compensation (id. at 607-608). All that is "taken" here is money, rather than the transfer of any interest in petitioners' real property, and the Fee is not requested in lieu of any such transfer, nor is it commandeered from any specific bank account (id. at 616).
Whatever other constitutional and statutory limitations may exist to prevent government regulatory overreach in the land use context, Nollan and Dolan have no application in this case (see id. at 618, 621 [indicating that the Due Process Clause protects permit applicants from an unfair allocation of public burdens and that applicants can also argue that a government's demand for property amounts to a taking as "regulation [that] goes too far" under the framework set forth in Penn Cent. Transp. Co. v City of New York (438 US 104 [1978]) (internal quotation marks and citation omitted)]; see also id. at 629 [Kagan, J., dissenting] [noting that "court(s) can use the Penn Central framework, the Due Process Clause, and (in many places) state law to protect against monetary demands, whether or not imposed to evade Nollan and Dolan, that simply go too far" (internal quotation marks and citation omitted)]). Petitioners' challenge fails to satisfy the predicate for an unconstitutional conditions claim (see id. at 612), and if they are entitled to any relief, it is through some other doctrine.
V.
Petitioners own or reside in property designated for JLWQA use as artist residences and workspaces. The City's 2021 rezoning plan creates an opportunity for owners of these units to voluntarily convert them into a different type of property, completely untethered from the property's previous JLWQA purpose. The plan does not affect owners and residents in their current use and enjoyment of their property if it remains a JLWQA-designated space. Moreover, there is no property interest that the City could take through eminent domain or condemnation rather than requesting a monetary payment to an arts fund. Thus, the City has neither coerced JLWQA property owners to cede an interest in their property for which the City would otherwise have to compensate them nor imposed a fee in lieu of requiring the transfer of a property interest.
Accordingly, the order of the Appellate Division should be reversed, with costs, and judgment granted to respondents in accordance with this opinion.

HALLIGAN, J. (concurring):

I agree with the majority that petitioners' Takings Clause claim fails because the Arts Fund fee is not an exaction which triggers scrutiny under Nollan v California Coastal Commission (483 US 825 [1987]) and Dolan v City of Tigard (512 US 374 [1994]). I write separately because in my view that is the only ground on which the fee can be upheld. For the reasons offered by the dissent, I am not persuaded that the lack of any entitlement to conversion or diminishment in the value of a JLWQA unit resolves the question before us (see dissenting op at 20-21).
The outcome of this dispute instead turns on how we interpret Koontz v St. Johns River Water Management District (570 US 595 [2013]). The dissent's reading of Koontz as extending Nollan/Dolan scrutiny to any "monetary exaction demanded from a real property owner, linked to a specific, identifiable property interest, in exchange for a governmental benefit tied to their property" (dissenting op at 2) has some merit, and it may well eventually prevail. But the dissent [*11]offers no viable distinction between the Arts Fund fee and any other permit fee, instead suggesting that "any" fee charged in connection with a land-use permit "must be properly tailored to pass the Nollan/Dolan test" (dissenting op at 16 [emphasis added]). That is a sweeping proposition. It would presumably include, for example, a modest fee—say, of twenty-five dollars—charged to process a permit application. Even if such a fee would pass the Nollan/Dolan test, I am not certain the Supreme Court meant to burden localities across the country by opening the door to litigation over this question in every instance. And such a result is difficult to square with Koontz's explicit statement that it "does not affect the ability of governments to impose property taxes, user fees, and similar laws and regulations that may impose financial burdens on property owners" (570 US at 615).
Rather than treating every charge for a permit application as a per se taking and subjecting it to Nollan/Dollan scrutiny, I would read Koontz as applying only to monetary conditions which are offered as an alternative to a condition that would be a per se taking if imposed directly. This approach would avoid the significant line-drawing problem that arises from the dissent's reading, and for the reasons set forth by the majority in Point IV-B, is consistent with the Supreme Court's guidance in this area.
Nor does this reading of Koontz shield the Arts Fund fee from constitutional scrutiny. At a rate of $100 per square foot of property, the fee could presumably amount to hundreds of thousands of dollars. Whether that is a "staggering financial burden" or not, any redress likely would lie in a different constitutional provision (Eastern Enterprises v Apfel, 524 US 498, 540 [1998, Kennedy, J., concurring in the judgment and dissenting in part]). The Due Process Clause, for example, protects against wholly arbitrary taxation schemes (see A. Magnano Co. v Hamilton, 292 US 40, 44 [1934]). By contrast, the Takings Clause is concerned "not with preventing arbitrary or unfair government action, but with providing compensation for legitimate government action that takes 'private property' to serve the 'public' good" (Eastern Enterprises, 524 US at 554 [Breyer, J., dissenting]). Koontz should not be understood to disrupt this principle by significantly expanding the Takings Clause's protection to purely monetary permit conditions, and thereby putting courts in the untenable position of deciding which monetary demands trigger heightened scrutiny.

GARCIA, J. (dissenting):

To obtain a permit from the New York City Department of Buildings to convert their property from restricted to unrestricted residential use, petitioners are required to pay a fee of $100 per square foot of the property into a fund dedicated to "support[ing] arts programming, projects, organizations, and facilities that promote the public presence of the arts." This fee is a monetary exaction demanded from a real property owner, linked to a specific, identifiable property interest, in exchange for a governmental benefit tied to their property. The U.S. Supreme Court's holding in Koontz v St. Johns River Water Management District requires that we apply a "per se takings" mode of analysis (570 US 595, 614 [2013]) and subject such a condition to heightened scrutiny under the test derived from Nollan v California Coastal Commission (483 US 825 [1987]) and Dolan v City of Tigard (512 US 374 [1994]). The exaction here fails that test and therefore the condition is unconstitutional.
I.
The Joint Live-Work Quarters for Artists (JLWQA) designation was established in 1971 with the passage of Multiple Dwelling Law §§ 275-278, giving artists living in certain former manufacturing units in SoHo and NoHo in contravention of the area's industrial-use only zoning a path to legal residency. Artists' occupancy in these units became legal if they received an artist certification from New York City's Department of Cultural Affairs and if their units met occupancy health and safety standards (Multiple Dwelling Law §§ 276, 277).
Over the next several decades, however, many uncertified non-artists resided in these units. Even after the passage of the Loft Law in 1982 (see Multiple Dwelling Law article 7-C), which allowed for conversion of some of these units into unrestricted residences—without any compensation for loss of restricted artist space—many of the remaining JLWQA-designated units were occupied by non-artists. A 1986 zoning amendment with the stated goal of "preventing large-scale displacement and thereby preserving the character and stability of these neighborhoods" provided amnesty to non-artist residents, making it legal for them to remain in their units and [*12]granting them familial succession rights. In the years that followed the 1986 amnesty, the City declined to enforce violations of the JLWQA restrictions, while the artist certification process stagnated. By 2022, approximately 1600 out of 1636 JLWQA-designated units were occupied by non-artists, and only four artists received certification in the last year.
To address concerns that the area's "current zoning and other land use controls restricted the neighborhood's ability to develop into a thriving, diverse, and inclusive community," the City's Department of City Planning began considering rezoning options for the SoHo/NoHo area. The Department ultimately recommended adopting the "Special SoHo-NoHo Mixed Use District" Plan that would, as relevant here, provide JLWQA residents—including non-artist residents—with the option to convert their units to unrestricted residential use. Permission was to be conditioned on a mandatory payment of $100 per square foot of floor area to be converted, made to the SoHo-NoHo Arts Fund (the Arts Fund). Although the local Community Board opposed this plan 36-1, the City Planning Commission approved it, and the City Council passed the zoning resolution two months later.
As enacted, the zoning resolution provides that, for JLWQA units, "any conversion to a residence shall only be permitted upon certification by the Chairperson of the City Planning Commission to the Commissioner of the Department of Building that instruments in a form acceptable to the City are executed and recorded and that, thereafter, a contribution has been deposited in the SoHo-NoHo Arts Fund." The payment of this "nonrefundable contribution" in the amount of $100 per square foot of floor area to be converted "shall be a precondition to the filing for or issuing of any building permit allowing the conversion" from JLWQA to unrestricted residential use (Zoning Resolution § 143-13 [emphasis added]). The Arts Fund, in turn, is to be used to "support arts programming, projects, organizations, and facilities that promote the public presence of the arts within the Special District" and "extend[ing] the cultural legacy of SoHo and NoHo generally" (id. at § 143-002). The resolution also provides that new "[c]onversions to [JLWQA status] shall not be permitted" (id. at § 143-13). No fee is imposed on the conversion of JLWQA units to retail establishments.
Petitioners are individual residents living in JLWQA units, some as non-conforming non-artist residents and some by virtue of their relationship to a certified artist, as well as an organization representing area residents opposed to the rezoning. Petitioners filed an article 78 petition and declaratory judgment action asserting, as relevant here, that the Arts Fund fee constitutes an unconstitutional taking. Supreme Court dismissed the petition, declining to analyze the constitutionality of the Arts Fund fee under the test from Nollan and Dolan (Nollan/Dolan) because "there was no demand to relinquish any portion of Petitioners' property and no 'in lieu' fee to avoid giving up such right to exclude" (2023 NY Slip Op 33457 [U] [Sup Ct, NY County 2023]). The Appellate Division reversed, holding that the Fee was a taking subject to the heightened scrutiny of Nollan/Dolan and that it did not pass that test (233 AD3d 433 [1st Dept 2024]). I agree with the Appellate Division that the Arts Fund fee is subject to, and fails, the Nollan/Dolan test, and would therefore affirm.
II.
The unconstitutional conditions doctrine is designed to "vindicate[] the Constitution's enumerated rights by preventing the government from coercing people into giving them up" (Koontz v St Johns River Water Mgmt. Dist., 570 US 595, 604 [2013]). At issue here is " 'a special application' of this doctrine that protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits," by "allowing the [*13]government to condition approval of a permit on the dedication of property to the public so long as there is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of the applicant's proposal" (id. at 605-606). The doctrine recognizes that "the government may choose whether and how a permit applicant is required to mitigate the impact" of its sought-after development, but cannot "leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts" (id. at 606). The two-part test seeks to prevent "[e]xtortionate demands for property in the land-use permitting context," which "run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just compensation" (id. at 607).
For the Nollan/Dolan test to apply, there must be a "predicate" taking—that is, "the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing" (Koontz, 570 US at 612). It is irrelevant to that determination whether the government "would have been entirely within its rights in denying the permit for some other reason," because "that greater authority does not imply a lesser power to condition permit approval on petitioner's forfeiture of his constitutional rights" (id. at 608).
At this step, the majority's analysis ends, declining to consider the Arts Fund fee under the Nollan/Dolan test by concluding that there is no such predicate taking, despite the Arts Fund fee being a condition imposed on a property owner's right to obtain a desired land-use permit. Why this is so is not entirely clear from the analysis, but two reasons are suggested: first, that the Arts Fund fee is exempt as a purely monetary exaction and not a physical taking or a fee imposed in lieu of a physical taking; and second, that the Arts Fund fee is somehow exempt because it is part of a zoning ordinance (majority op at 10, 17-18). The first reason is clearly foreclosed by Koontz; the second is refuted by the case law and, moreover, would have the unacceptable effect of removing from constitutional scrutiny any conditions imposed by means of zoning ordinances, including not only monetary exactions but demands for easements.
III.
Recognition of the unconstitutional conditions doctrine in the context of the Takings Clause began with Nollan and Dolan, each involving a demand for a physical taking of a property interest in the subject land. In Nollan, a coastal development permit was conditioned on the property owner granting the public an easement to traverse the property (483 US at 828-829). The Court explained that, while the Commission could have constitutionally conditioned the permit in a way that "protected the public's ability to see the beach notwithstanding construction of the new house" or "require[d the property owner to] provide a viewing spot on their property," such "evident constitutional propriety disappears . . . if the condition substituted for the prohibition utterly fails to further the end advanced as the justification for the prohibition" (id. at 836). That justification was lacking, the Court held, because the ability to walk across the property did not reduce any obstacles to viewing the beach that construction of a larger house created (id. at 838-839). Without such an "essential nexus," any restriction becomes "not a valid [*14]regulation of land use but an out-and-out plan of extortion" (id. at 837 [citation and internal quotation marks omitted]), in which the government improperly uses its leverage over the property owner to obtain an easement for which it otherwise would have needed to provide compensation. The Court acknowledged the "heightened risk" in the land-use context "that the purpose [of the governmental action] is avoidance of the compensation requirement, rather than [any] stated police-power objective," and concluded that there, "if [the Commission] wants an easement across the Nollans' property, it must pay for it" (id. at 841-842).
In Dolan, the predicate taking was a demand that the property owner dedicate portions of her property for a public greenway and pedestrian path in exchange for permission to increase the size of the commercial area on the property (512 US at 380-382). The landowner challenged imposition of the condition on the basis that the government had "not identified any 'special quantifiable burdens' created by her [development] that would justify the particular dedications required from her" (id. at 386). In order to address the question of "whether the degree of the exactions demanded by the city's permit conditions bears the required relationship to the projected impact of petitioner's proposed development," the Court instituted a "rough proportionality" component to the test, requiring "[n]o precise mathematical calculation" but instead "some sort of individualized determination" to ensure "that the required dedication is related both in nature and extent to the impact of the proposed development" (id. at 388, 391). The Court has since explained that the rough proportionality element is necessary because "[a] permit condition that requires a landowner to give up more than is necessary to mitigate harms resulting from new development has the same potential for abuse as a condition that is unrelated to that purpose" (Sheetz v County of El Dorado, California, 601 US 267, 276 [2024]). While the Court held that requiring the property owner to provide a public greenway and pedestrian path to address concerns about the city's flood control capabilities had a sufficient nexus, these conditions were deemed out of proportion to the impact of the proposed development (512 US at 394-395).
These two cases involved conditioning approval on the surrender of part of the subject property, that is, approval conditioned on the provision of physical access or the dedication of real property for a public purpose. In the wake of Dolan, however, several courts applied that standard to cases involving purely monetary exactions (see e.g. Town of Flower Mound v Stafford Estates Limited Partnership, 135 SW3d 620 [Tex 2004] [applying Nollan/Dolan to condition requiring developer to finance [*15]improvements to abutting streets]; Home Builders Assn. of Dayton & the Miami Valley v Beavercreek, 89 Ohio St 3d 121, 128 [2000] [applying Nollan/Dolan to impact fee designed to fund new roadway projects]; Ehrlich v City of Culver City, 12 Cal 4th 854, 859, 874-876 [1996] [applying Nollan/Dolan to "development permits that exact a fee as a condition of issuance"]; Northern Illinois Home Builders Assn. v County of Du Page, 165 Ill 2d 25 [1995] [applying Nollan/Dolan to transportation impact fee]). Other courts declined to apply it to such conditions (Krupp v Breckenridge Sanitation Dist., 19 P3d 687, 697-698 [Colo 2001]; Home Builders Assn. v City of Scottsdale, 187 Ariz 479, 486 [1997]; McCarthy v City of Leawood, 257 Kan 566 [1995]). The U.S. Supreme Court resolved the issue in Koontz, however, when it confirmed that a monetary exaction alone may qualify as an unconstitutional condition, requiring scrutiny under the Nollan/Dolan test (570 US at 618 [specifically citing Flower Mound, Beavercreek, and DuPage as correctly applying Nollan/Dolan scrutiny in the context of monetary exactions]).
In Koontz, petitioner sought to develop 3.7 of 14.9 total acres of property, whose classification as wetlands required him to apply for a permit (570 US at 601). The St. Johns River Water Management District (the "District") had jurisdiction over petitioner's land and required "that permit applicants wishing to build on wetlands offset the resulting environmental damage by creating, enhancing, or preserving wetlands elsewhere" (id.). "To mitigate the environmental effects of his proposal," petitioner offered to grant the District an 11-acre conservation easement on the remainder of the land (id.). The District denied his request for a permit, demanding that petitioner also "agree[] to hire contractors to make improvements to District-owned land several miles away" (id. at 602). As an alternative "concession" by the landowner, the District would accept a proposal that limited the development to 1 acre with all remaining acres deeded to the District as a conservation easement (id. at 601-602).
Petitioner challenged the denial as unconstitutional, and ultimately the Florida Supreme Court disagreed, holding that "the Nollan/Dolan rule . . . is applicable only where the condition/exaction sought by the government involves a dedication of or over the owner's interest in real property in exchange for permit approval" and so, "[s]ince St. Johns did not condition approval of the permits on [petitioner] dedicating any portion of his interest in real property in any way to public use, this analysis does not apply" (St. Johns River Water Mgmt. Dist. v Koontz, 77 So 3d 1220, 1230-1231 [Fla 2011]). That opinion is devoid of reference to or discussion of an "in lieu of" fee.
Petitioner appealed to the Supreme Court, explaining that, in the wake of Nollan and Dolan, "land-use authorities increasingly have resorted to confiscating property other than interests in real property—most often, money, in the form of either financing of public projects (as in [petitioner's] case) or payment of fees in-lieu of a land dedication" (brief for petitioner in Koontz v St. Johns River Water Management District, 570 US 595 [2013], available at 2012 WL 5940280, *14 [emphasis added]). The District, according to petitioner, was "not entitled to unfettered power to confiscate anything it wanted from Mr. Koontz, simply because . . . the target of its demand was Mr. Koontz's money, as opposed to an interest in his land" (id. at 44). In response, the District challenged "[p]etitioner's theory . . . that conditioning the issuance of permits on his agreement to spend money performing off-site mitigation would be a taking of his money," asserting that "a financial obligation is not a taking" and that "Nollan and Dolan should not be extended to reach conditions that merely require an applicant to spend money to satisfy regulatory standards" (brief for respondents in Koontz v St. Johns River Water Management District 570 US 595 [2013], available at 2012 WL 6694053, *44, 48). The only mention by the District of any "in lieu" proposal was to suggest that the offsite mitigation fee was offered in lieu of the petitioner's own offer of an 11-acre easement, not that the money was a substitute for any additional easement demand (see id. at 9, 39). And in reply, petitioner argued that "the District's requirement that [petitioner] personally finance public improvements to its lands was not an economic regulation, but a targeted and individualized demand for his funds . . . imposed with regard to a specific property interest: his land," with the "need and amount of the exaction [based] on the alleged impact of his proposed land use" (reply brief for petitioner in Koontz v St. Johns River Water Management District, 570 US 595 [2013], available at 2013 WL 98694, *19). Simply put, there was no finding by the Florida Supreme Court, or any argument made by the parties, that the fee was demanded as an alternative to increasing the size of the easement.
The U.S. Supreme Court agreed with petitioner, rejected the Florida Supreme Court's holding that Nollan and Dolan did not apply based on a distinction "between a demand for an interest in real property . . . and a demand for money," and instead held that "the government's demand for property from a land-use permit applicant must satisfy the requirements of Nollan and Dolan even when . . . its demand is for money" (520 US at 603, 619). The Court explicitly rejected the Florida Supreme Court's holding "that petitioner's claim fails at this first step because the subject of the [*16]exaction at issue here was money rather than a more tangible interest in real property" as well as the District's argument that "an obligation to spend money can never provide the basis for a takings claim" (id. at 612). The Court explained that "the monetary obligation burdened petitioner's ownership of a specific parcel of land;" as a result, "[t]he fulcrum this case turns on is the direct link between the government's demand and a specific parcel of real property," thereby "implicat[ing] the central concern of Nollan and Dolan: the risk that the government may use its substantial power and discretion in land-use permitting to pursue governmental ends that lack an essential nexus and rough proportionality to the effects of the proposed new use of the specific property at issue" (id. at 613-614).
A review of the District's demands on the landowner in Koontz makes clear the scope of the Supreme Court's holding. As the Court explained, "so long as a permitting authority offers the landowner at least one alternative that would satisfy Nollan and Dolan, the landowner has not been subjected to an unconstitutional condition" (id. at 611). The first option involved developing only one acre of the site and deeding to the District a conservation easement on the remaining acres (id. at 601, 611). As a demand for additional acreage for the easement, this alternative clearly qualified for heightened scrutiny. The second offer accepted the owner's proposal (a 3.7 acre development with an 11-acre conservation easement) but also demanded that petitioner "hire contractors to make improvements to District-owned land several miles away" as "offsite mitigation" (id. at 602). As the Court framed the issue:
"Petitioner sought to develop 3.7 acres, but respondent in effect told petitioner that it would not allow him to build on 2.7 of those acres unless he agreed to spend money improving public lands. Petitioner claims that he was wrongfully denied a permit to build on those 2.7 acres. For that reason, respondent's offer to approve the less ambitious building project does not obviate the need to determine whether the demand for offsite mitigation satisfied Nollan and Dolan" (id. at 611 [emphasis added]).
In other words, it was the fact that development of the full 3.7 acres was conditioned on the monetary exaction that was the issue, not a demand for money "in lieu" of an easement. The holding of Koontz therefore requires that such monetary exactions as conditions on permit approvals be examined under the Nollan/Dolan standard.
As one might expect, the issue decided by the Florida Supreme Court and briefed by the parties on appeal was the issue the U.S. Supreme Court decided. The majority instead writes its own ending, concluding that Koontz "is properly understood as limited to 'in lieu of' fees, where a property owner faces a choice between paying money or transferring an interest in real property as a condition of obtaining their desired land-use permit" (majority op at 22; see also concurring op at 2-3). But there is no such limiting language (majority op at 22) in Koontz—unsurprising [*17]given that neither the Florida Supreme Court nor the parties ever discussed that type of arrangement. And the Supreme Court's sole reference in Koontz to the "in lieu" demand is in a hypothetical example of what could be done with monetary exactions if, as the majority here would have it, that power was left unchecked. In rejecting the holding of the Florida Supreme Court, a view the District continued to press at the U.S. Supreme Court, that "petitioner's claim fails at this first step because the subject of the exaction was money rather than a more tangible interest in real property," the Court noted "as an initial matter that if we accepted this argument it would be very easy for land-use permitting officials to evade the limitations of Nollan and Dolan" and exact an easement by giving the landowner "a choice of either surrendering an easement or making a payment equal to the easement's value," adding that "such so-called 'in lieu' fees are utterly commonplace . . . and they are functionally equivalent to other types of land use exactions" (570 US at 612 [emphasis added]). The "in lieu of" demand was not the choice offered by the District to petitioner; it was a hypothetical offered by the Court to demonstrate the absurdity of exempting monetary exactions from heightened scrutiny. So, as the Court explained, it was "[f]or that reason and those that follow [that] we reject respondent's argument and hold that so-called 'monetary exactions' must satisfy the nexus and rough proportionality requirements of Nollan and Dolan" (id.). The hypothetical served only to reinforce the necessity for the general rule.
Following Koontz, there can be no doubt that "monetary exactions are subject to scrutiny under Nollan and Dolan" (id. at 616), particularly in light of Koontz's favorable citations to cases applying Nollan/Dolan to purely monetary exactions (see 570 US at 618). What the majority holds is instead derived from Justice Kagan's dissent in Koontz, including the warning that adopting the "radical view" that application of the unconstitutional conditions doctrine to monetary exactions would have dire consequences by bringing taxes and other similar fees within the reach of the Nollan/Dolan test (majority op at 21; see Koontz, 570 US at 626-627 [Kagan, J., dissenting] ["By applying Nollan and Dolan to permit conditions requiring monetary payments—with no express limitation except as to taxes—the majority extends the Taking Clause . . . into the very heart of local land-use regulation and service delivery" and as a result fees such as those imposed for water service, increased traffic, or liquor licenses "(a)ll now must meet Nollan and Dolan's nexus and proportionality tests"]). The majority too may find the Supreme Court's holding in Koontz "radical," but it is neither new nor optional.[FN1]
As the Supreme Court made clear, "when the government commands the relinquishment of funds linked to a specific identifiable property interest such as a bank account or parcel of real property, a per se [takings] approach is the proper mode of analysis under this Court's precedent" (Koontz, 570 US at 614 [quotation marks and citation omitted]; but see concurring op at 2-3). In sum, "whatever the wisdom" in "order[ing] a landowner to make improvements to public lands that are nearby[,] . . . it would transfer an interest in property from the landowner to the government [and f]or
that reason, any such demand would amount to a per se taking similar to the taking of an easement or a lien" (id. at 615 [emphasis added]). And the logical result of properly applying Koontz is not that the government can never impose "land-use related demand[s] for money" (majority op at 21), but that any such demand must be properly tailored to pass the Nollan/Dolan test.
The Supreme Court's most recent case applying the unconstitutional conditions doctrine in this context involved a property owner challenging a traffic mitigation fee required by local legislation as a condition to build on his residential property (Sheetz, 601 US at 275-278). The Supreme Court held that the Nollan/Dolan test applies to legislatively imposed conditions and is not limited to ad hoc determinations by administrative agencies (id.). Of course, such a determination would have been moot had this purely monetary condition fallen outside Nollan/Dolan's reach; however, two Justices asserted that this "antecedent question" remained unanswered (id. at 291 [Sotomayor, J., concurring] ["The question presented in this case did not include that antecedent question: whether the traffic impact fee would be a compensable taking if imposed outside the permitting context and therefore could trigger Nollan/Dolan scrutiny"]; see majority op at 16).
On remand from the Supreme Court, the California Court of Appeal considered that antecedent question and, unlike the majority here, acknowledged that it was resolved by Koontz [FN2] [*18](335 Cal Rptr 3d 316 [Cal Ct App 2025] [review denied and ordered not to be officially published], previously published at 113 Cal App 5th 113, 136 [Cal Ct App 2025] ["Koontz controls the predicate taking question," and "because there is a 'direct link' between the County's demand that Sheetz make a monetary payment to improve public roadways and a specific parcel of real property (Sheetz's residential parcel), the challenged permit condition . . . is subject to the heightened scrutiny of Nollan and Dolan"]). That court expressly rejected any distinction between the fee at issue and an "in lieu of" fee, reasoning that "the [Koontz] majority's holding was clearly not limited to those precise fees or monetary exactions"—because the condition involved "an extortionate demand for private property (money) made by the County in response to [Sheetz's] application," it was subject to Nollan/Dolan scrutiny (id. at 136-137). Other courts have reached the same conclusion (see Anderson Creek Partners, LP v County of Harnett, 382 NC 1, 28 [2022] [concluding that "the 'monetary exactions' with which Koontz was concerned were not limited to 'in lieu of' fees and instead, encompassed a
broader range of governmental demands for the payment of money as a precondition for the approval of a land-use permit" and subjecting water and sewer fees charged as a "precondition" for obtaining development permit to Nollan/Dolan scrutiny]); Charter Township of Canton v 44650, Inc., 346 Mich App 290, 324-325 [2023] [rejecting argument that Koontz did not apply because there was no "demand for an easement or a demand for money in lieu of that easement," concluding instead that Koontz "did not limit the applicability of the unconstitutional-conditions doctrine to money demands in lieu of dedication," and holding that ordinance conditioning tree removal permit on agreement to plant replacement trees or pay into "the township tree fund" was subject to Nollan/Dolan test]).
The same is true of conditioning conversion of JLWQA units on payment of the Arts Fund fee here—this condition is a per se taking under Koontz and so must be subject to Nollan/Dolan scrutiny. There is, as in Koontz, a direct link between the government's demand and a specific parcel of property. To obtain permission to convert a JLWQA unit, the property owner must accede to the government's demand for payment into the Arts Fund. The fee, therefore, is a financial burden placed on the property owner's ability to obtain a governmental land use benefit, here a permit allowing conversion to unrestricted residential status. As with the condition subject to Nollan/Dolan scrutiny in Koontz, the Arts Fund fee is a condition requiring a landowner to dedicate funds for public use. The majority's decision to insulate the Arts Fund fee from Nollan/Dolan scrutiny by limiting Koontz to "in lieu of" fees mistakes the central holding in that case, and while the majority may find its rule more palatable, it is not the law.
IV.
The only other basis for the majority's decision to shield the Arts Fund fee from heightened scrutiny appears to be a notion that zoning ordinances are treated differently (majority op at 2-3, 10). But Sheetz made clear that a legislatively imposed condition affecting a broad swath of property owners is subject to Nollan/Dolan, and that such scrutiny applies whether a benefit is requested on an ad hoc basis or sought through more generally applicable statutes (601 US at 271, 276-280). And the majority acknowledges that the zoning ordinance is not entitled to any presumption of constitutionality (majority op at 10).
There is no support for the notion that zoning legislation is shielded from scrutiny merely because it relates to zoning. Zoning legislation such as the ordinance at issue here offers a benefit to a landowner in exchange for a fee; the resolution outlines a pathway, and condition precedent, to obtaining a permit for the benefit (see e.g. Board of Supervisors of County of Albermarle v Route 29, LLC, 301 Va 134, 146 [2022] [owner of land asserted valid cause of action under Koontz where transit fee was imposed as a condition on rezoning]). If zoning legislation were categorically exempted from Nollan/Dolan, governments could simply impose conditions that would otherwise run afoul of Nollan/Dolan, or at least would require heightened scrutiny, by demanding easement concessions in exchange for zoning variances—the very risk identified in Koontz. It cannot be that the protections of the unconstitutional conditions doctrine simply disappear before a zoning board.
V.
Several other scattershot assertions in the majority's analysis that may be taken as support for its position reflect a misunderstanding of how the unconstitutional conditions doctrine operates. For example, the majority deems relevant that "[p]etitioners knowingly assumed a property interest in JLWQA-restricted spaces" (majority op at 17) and that the "fee has not extinguished or diminished petitioners' property rights" nor "eliminate[d] or burden[ed] petitioners' existing property interest" (majority op at 2-3, 17). But many of the cases applying Nollan/Dolan involve petitioners looking to change or develop land that they acquired with known limitations on that land, and the Supreme Court has never used that advanced knowledge of a restriction as a relevant factor in the analysis. Nor does it matter that petitioners were not otherwise entitled to conversion out of JLWQA status. As Koontz explained, "[v]irtually all of our unconstitutional conditions cases involve a gratuitous governmental benefit of some kind," "[y]et we have repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights" (id. at 608). Accordingly, the fact that petitioner is not otherwise entitled to conversion, and that the City could have declined to provide the "opportunity to transform the essential nature of a restricted JLWQA unit into a different, unrestricted interest" (majority op at 2), does not remove the Arts Fund fee condition from the ambit of Nollan/Dolan.
Nor does the fact that removal of the JLWQA restriction will increase the property's value change the analysis (but see majority op at 18 ["The Fee imposed on the owner of a JLWQA unit for the opportunity to acquire a greater property interest than they currently hold is not a compensable taking"]). That is the entire premise of the unconstitutional conditions doctrine—the fact that "the government often has broad discretion to deny a permit that is worth far more than property it would like to take," thereby rendering "the owner . . . likely to accede to the government's demand, no matter how unreasonable" (Koontz, 570 US at 605).
Finally, the majority insists that petitioners "do not seek to simply make use of the property in a way currently prohibited by the City" (majority op at 17). But, of course, they do—they wish to have a restriction on their property removed, or to seize the "opportunity to transform the essential nature" of a "private property interest" (majority op at 2, 3). And the City has imposed on the opportunity to remove that restriction a financial obligation. Whether that obligation has a sufficient nexus and is roughly proportional to the impact of petitioners' decision to use that option must be examined.
VI.
The Arts Fund fee, once made subject to the Nollan/Dolan test, fails on both the nexus and proportionality prongs. Initially, the record is devoid of evidence that conversion will have any impact at all on the local artist community. The JLWQA restriction was first imposed to legalize the nonconforming residential use of manufacturing property in the 1970s (not, as with the zoning resolution here, "to sustain SoHo/NoHo's cultural legacy and support New York City's creative economy"). In fact, the parties' stipulation in this case included a quotation from the "Envision SoHo/NoHo" report, issued by stakeholders before the ultimate rezoning plan was devised, that the current zoning restriction actually "restricted the neighborhood's ability to develop into a thriving, diverse, and inclusive community" and "acknowledged multiple challenges associated with JLWQA restrictions, including a scarcity of certified artists available to purchase." And the zoning resolution specifically prohibits any conversion into JLWQA status. The entire premise of the decision to permit removal of JLWQA restriction was based on evidence that the restriction no longer served any purpose. Indeed, the record shows that only 36 of 1636 units were occupied by conforming residents as recently as 2022, and that in some other recent years, no artist certifications were issued.
Because there is minimal, if any, effect on the artist population in the neighborhood caused by the conversion out of JLWQA restriction, there is no nexus between that impact and the demand for financial support for "arts programming," "the public presence of the arts," or the "exten[sion] of the cultural legacy" of the neighborhood. That is, the Arts Fund fee provides a benefit—but it is not one that compensates for any impact of the conversion of JLWQA units [FN3]. Because the "condition [does not] serve[] the same governmental purpose" as the zoning restriction, imposition of the fee amounts to an extortionate demand prohibited by Nollan (483 US at 837).
Indeed, the Arts Fund fee suffers from the same flaw as the required condition in Nollan, where the Supreme Court found it "quite impossible to understand how a requirement that people already on the public beaches be able to walk across the Nollans' property reduces any obstacles to viewing the beach created by" the proposed development (483 US at 838). Here, it is difficult to understand how a requirement to pay into a general fund for supporting arts programming reduces the impact of conversion from a JLWQA unit currently occupied, in nearly every case, by a non-artist.
Because minimal, if any, societal cost is incurred by conversion, the fee can never meet the rough proportionality element of the test. The City sought to achieve that proportionality by calculating the amount of the fee based on a study showing that average sales of unrestricted units in the neighborhood were $189 per square foot higher than JLWQA units, and explains that the $100 [*19]per square foot fee therefore amounts to "roughly . . . half of the expected increase in cost to purchase or lease space that was previously restricted to JLWQA." But as explained, current JLWQA units are occupied almost entirely by non-artists, and there is a "scarcity of certified artists able to purchase." Because there is no evidence of the articulated societal cost, imposition of the fee can never be proportional. Nor does it suffice to say that the fee is proportional merely because conversion will increase the unit's market value. As discussed, unconstitutional conditions work because a government obtains leverage over the homeowner by denying a discretionary benefit that would increase the value of the property—that leverage is only effective if the benefit obtained outweighs the cost of the condition imposed (see Koontz, 570 US at 605 ["(s)o long as the building permit is more valuable than any just compensation the owner could hope to receive for the right-of-way, the owner is likely to accede to the government's demand, no matter how unreasonable"]). No condition based on an illusory impact would be proportional.
VII.
Promoting the arts and preserving the cultural legacy of SoHo and NoHo may be laudable goals as the City seeks to revisit the area's zoning restrictions. But "a strong public desire to improve the public condition will not warrant achieving the desire by a shorter cut than the constitutional way of paying for the change" (see Dolan, 512 US at 396 [citations, alterations, and internal quotation marks omitted]). In Sheetz, a unanimous Supreme Court described a quintessential violation of the unconstitutional conditions doctrine, whereby a municipal planning commission denies a building permit unless the owner allows the commission "to host its annual holiday party in her backyard . . . [and s]o too if the commission gives the landowner the option of bankrolling the party at a local pub instead of hosting it on her land" (601 US at 275). Likewise, the City may not use the permitting process to force petitioners to host Shakespeare in their loft, nor to fund Shakespeare in the Park. I dissent.
Order reversed, with costs, and judgment granted to respondents in accordance with the opinion herein. Opinion by Judge Rivera. Chief Judge Wilson and Judges Singas, Cannataro and Troutman concur. Judge Halligan concurs in result in an opinion. Judge Garcia dissents and votes to affirm in an opinion.
Decided January 13, 2026

Footnotes

Footnote 1:"The Loft Law . . . was enacted . . . to resolve the 'serious public emergency . . . created by the increasing number of conversions of commercial and manufacturing loft buildings to residential use without compliance with applicable building codes and laws' " (Aurora Assoc. LLC v Locatelli, 38 NY3d 112, 115 [2022], quoting MDL § 280). As this Court has stated, "the Loft Law provisions created a pathway to legalization for former commercial and manufacturing loft buildings used as residences despite a lack of residential occupancy certificates pursuant to a process overseen by the Loft Board" (id., citing MDL § 282).

Footnote 2:The City faced "unique difficulties with enforcement of the certified artist provision" (City Planning Commission Report, dated December 22, 1986 at 5).

Footnote 3: In Sheetz, the petitioner challenged local legislation requiring the payment of a "traffic impact fee," designed to mitigate the effects of development on local traffic congestion, as a condition to receive a permit to build on residential property as an "unlawful exaction" of money under the Takings Clause (601 US at 270). The Supreme Court did not reach the question of whether that fee must be subjected to Nollan/Dolan scrutiny, as it resolved the case on narrow grounds (id. at 279).

Footnote 4: The dissent misrepresents our holding when it states that the Fee "is exempt as a purely monetary exaction and not a physical taking or a fee imposed in lieu of a physical taking"
(dissenting op at 6). "Monetary exaction" is a term of art, and nowhere in our opinion do we refer to the Fee in this case as such.

Footnote 5: In reaching its interpretation of Koontz, the dissent relies on a decertified opinion of the California Court of Appeal, on remand from the U.S. Supreme Court following its ruling in Sheetz, that was ordered not to be published (see dissenting op at 16-18, 17 n 2, citing 335 Cal Rptr 3d 316 [Cal Ct App 2025]). We do not respond to this line of the dissent's argument. The California Rules of Court expressly prohibit courts or parties, in other actions, from relying on or citing to an unpublished opinion (Cal Rules of Ct rule 8.1115 [a]; see also People v Goldman, 35 NY3d 582, 622 n 7 [2020] [Rivera, J., dissenting]; Locke v Aston, 31 AD3d 33, 37 n 2 [1st Dept 2006] [declining to rely on a depublished California case on the grounds that the California Rules of Court prohibit the citation of unpublished opinions]; George M. Weaver, The Precedential Value of Unpublished Judicial Opinions, 39 Mercer L Rev 477, 493 [1988] [explaining that unpublished opinions are not precedent due to their lack of promulgation]). The dissent doubles down on its reliance on the decertified opinion by claiming that it is "part of the procedural history of a key Supreme Court holding" (dissenting op at 17 n 2). But when an opinion of a California Court of Appeal is ordered not to be published, it is no longer part of the jurisprudence of the California courts (see Cal Rules of Ct rule 8.1115 [a]). The dissent's reference to California case law indicating that California courts permit "[o]pinions from other jurisdictions [to] be cited without regard to their publication status" (dissenting op at 17 n 2, citing Lebrilla v Farmers Group, Inc., 119 Cal App 4th 1070, 1077 [2004]) is not to the contrary, and does not provide support for this Court to disregard California's rules.

Footnote 1: The concurrence's excuse for refusing to apply the Nollan/Dolan test to monetary demands, namely its theory that "any redress likely would lie in a different constitutional provision" (concurring op at 3 [citing Eastern Enterprises v Apfel, 524 US 498, 540 (1998, Kennedy, J., concurring in the judgment and dissenting in part]), has already been rejected by the majority in Koontz (570 US at 618-619 ["We have repeatedly rejected the dissent's contention that other constitutional doctrines leave no room for the nexus and rough proportionality requirements of Nollan and Dolan"]; see also id. at 612 [rejecting the dissent's "position citing the concurring and dissenting opinions in Eastern Enterprises . . . for the proposition that an obligation to spend money can never provide the basis for a takings claim"]). The concurrence's view that subjecting monetary exactions to the Nollan/Dolan test would "put[] courts in the untenable position of deciding which monetary demands trigger heightened scrutiny" (concurring op at 3) has also been rejected by the Supreme Court (see Koontz, 570 US at 616 [the problem of distinguishing "taxes from takings is not a creature of our holding today that monetary exactions are subject to scrutiny under Nollan and Dolan" but a "problem . . . inherent in this Court's long-settled view that property the government could constitutionally demand through its taxing power can also be taken by eminent domain," and "our cases show that teasing out (this difference) is more difficult in theory than in practice"]); see also id. at 617 n 3 [using the state court cases cited by the dissent to make the same point]). There can be no serious argument that the Arts Fund fee is a tax or a user fee.

Footnote 2: On November 12, 2025, the California Supreme Court denied review and ordered that the Appeal Court opinion be decertified (335 Cal Rptr 3d 316 [Cal Ct App 2025]). The majority would remove the analysis in that case from consideration based on the local California rule limiting the use of its own unpublished decisions by California courts, relying for authority on language from a dissent in this Court (see majority op at 19 n 5 [citing People v Goldman, 35 NY3d 582, 622 n 7 [2020] [Rivera, J., dissenting]). This seems a particularly ill-timed limitation on this Court's ability to consider out-of-state opinions given that the analysis at issue is part of the procedural history of a key Supreme Court holding. It is also not one to which California courts hold themselves (see Lebrilla v Farmers Group, Inc., 119 Cal App 4th 1070, 1077 [2004] [citing 9 Witkin, California Procedure [4th ed 1997] ["Opinions from other jurisdictions can be cited without regard to their publication status"]).

Footnote 3: A review of the unadopted recommendations in the Envision SoHo/NoHo report demonstrates how, even if removal of JLWQA restrictions were shown to have some impact, any nexus to the Arts Fund fee is absent. The report suggested that, should the City decide to allow conversion away from the JLWQA restriction, the City could rectify any negative impact by providing rental assistance for low-income artists in the neighborhood; modernizing the artist certification process; providing for property tax abatements and other financial incentives for artists; converting underused spaces to artist workspace; or creating shared studio/co-working spaces for artists, to give some examples. Each of these suggested recommendations bears directly on the ability of artists to live and make art in the neighborhood—the only possible impact caused by the removal of JLWQA restrictions. In comparison, the ill-defined Arts Fund does not.